RICHARD CECH, as Administrator of the Estate of KELLY CECH, Deceased, and as Guardian of the Estate of BRUCE CECH and KERRY CECH, Minor Children, Plaintiffs and Respondents, v. THE STATE OF MONTANA, Defendant and Appellant.

No. 14216.

Submitted Dec. 20, 1978.

Decided Aug. 1, 1979.

598 P.2d 584.

Mr. Justice Sheehy dissented and filed opinion in which Mr. Justice Daly concured.

Mr. Justice Shea concurred specially and filed opinion.

Corette, Smith & Dean, Butte, Dolphy O. Pohlman, argued, Butte, for defendant and appellant.

Berger, Anderson, Sinclair & Murphy, Billings, Richard W. Anderson argued, Billings, for plaintiffs and respondents.

MR. JUSTICE HARRISON delivered the opinion of the Court.

Plaintiff Richard Cech, as personal representative of the estates of his wife, Arlene Cech and his child, Kelly Cech, and as guardian of the estates of his children Bruce and Kerry Cech, sued the State of Montana under provisions of the Montana Tort Claims Act, for damages resulting from an automobile accident on Interstate 90, approximately eleven miles east of Whitehall, Montana. The jury trial began November 14, 1977, in the District Court of the Sixth Judicial District, Park County. The jury returned four separate verdicts for plaintiff as follows:

For the estate of Arlene Cech . . . . . . . . . . . . . . . . . . . . . $15,000
(deceased)

For the estate of Kelly Cech . . . . . . . . . . . . . . . . . . . . . . $35,000
                 (deceased)

For the estate of Bruce Cech . . . . . . . . . . . . . . . . . . . . . . $25,000
                 (minor child)

For the estate of Kerry Cech . . . . . . . . . . . . . . . . . . . . . . $25,000
                 (minor child)

The State raises the following issues for our review:

1. Whether the District Court erred by denying the State's motions for directed verdict made at the close of plaintiff's case-in-chief and at the close of all the evidence?

2. Whether the District Court erred in admitting evidence of subsequent remedial measures?

3. Whether there is substantial evidence to support the jury verdict in favor of plaintiff?

Since the State's issues center on sufficiency of the evidence and the propriety of admitting certain evidence, a more complete statement of the facts appears as the issues are discussed. Suffice it to say now that the single-vehicle accident subject of this action occurred on the afternoon of November 29, 1974, on Interstate 90, on a portion of that road known as Cottonwood Hill.

Richard Cech was driving the family car, a 1967 Rambler, west on the freeway. His passengers were his wife, Arlene, and three of their seven children. The weather on the day of the accident was described by Cech as "sunshiny," "cool," "clear and "fairly nice." He testified that the road was "fairly dry" and "in good shape" from Livingston, the town from which they were traveling, to Bozeman. From Bozeman westward the conditions were different; the left lane was snow-packed, but the right lane, in which he was driving, was "dry" according to Cech. He testified that near the hill on which the accident occurred both lanes had started to clear up and there was less snow on the road.

Cech further testified that he was driving around 55 miles an hour and had maintained that speed almost all the way even though it was winter and his car did not have snow tires. He stated

that he did not recall seeing the roadside sign warning of ice on the next three miles of highway, within which space the accident occured. Going down the hill the car went into a side skid. The front of the car was pointing toward the center of the highway, but suddenly turned back and left the road.

Cech stated that he did not brake while on the highway or once the car had left the pavement. However, once the car left the road and was on the "field or pasture" as he described it (the State calls it the "recovery area"), he testified that he must have been braking because "the car was coming to a slower motion." The car did not stop within this area, but went over the edge into a ravine. Cech's wife was killed in the accident; the boy Kelly, died in a Great Falls hospital about a week later; and the other two boys and Cech himself sustained relatively minor injuries from which they recovered.

The State challenges the legal propriety of the verdicts and directs the Court's attention to evidence supporting its defenses that the design and construction of that portion of the Interstate were proper and in accordance with accepted standards, conforming to the state of the art at the time.

While three issues are set forth by the State, in view of the return of the case for retrial, we will discuss only the first two issues upon which our decision to reverse is based.

At the time of trial, after submission of plaintiff's pretrial memorandum and his counsel's statements of clarification made during trial the only issue was whether the State was negligent in not placing guardrails at the edge of the Interstate where the accident occurred after the initial construction and before the accident involving the Cech family. Plaintiff's counsel stated, "This case is limited strictly to the subject of guardrails. And we aren't contending there is any engineering defect other than that." During cross-examination, plaintiff's counsel made it clear that he was not alleging or contending that the State failed to warn of icy road conditions or that plaintiff's visibility was in any way interfered with or obstructed at the time of the accident.

At the close of plaintiff's case, the State made a motion for a directed verdict which reads in part:

"MR. POHLMAN: Comes now the Defendant, and pursuant to Rule 50 of the Montana Rules of Civil Procedure, moves for a directed verdict in favor of the Defendant, upon the grounds and for the reasons that Plaintiff has not by a preponderance of the evidence proved a prime [sic] facie case, in that the Defendant negligently designed the highway in question in its initial design. And further, that the Defendant negligently failed to provide adequate guardrails at the scene in accordance with its initial design of guardrails. And further, that the Plaintiff has not proved a prime [sic] facie case that the Defendant negligently constructed the highway in question in accordance or not in accordance with the design as to the highway, including guardrail and other factors or elements of design and construction. Further, that we want to note to the Court that in Plaintiff's Pre-Trial memorandum Plaintiff has abandoned and withdrawn all initial contentions that the Defendant negligently failed to give warning of hazards, and that Defendant negligently maintained the highway, and in the terms of the Plaintiff's Pre-Trial memorandum, as maintenance pertaining to the usual procedure of sanding, et cetera. The Motion is based upon the record and the testimonial evidence and the exhibits in the Plaintiff's case in chief. Further, that there has been no testimony or other evidence presented by Plaintiff whatsoever showing or proving that there was negligence in the design of the highway on behalf of the State of Montana. That there was no evidence whatsoever by expert testimony or otherwise that there was a duty or standard of care for the design of the highway as to alignment, slope, grade, guardrail placement, recovery area, signing or any other concepts of design. And further, that there was no evidence presented by Plaintiff that there was any such breach of the said duty or standard of care by the Defendant.

"Further, that there has been no testimony or other evidence presented by Plaintiff proving the Defendant was negligent in failing to provide guardrails subsequent to the original design and construction but prior to the Cech accident of 11-29-74. And further, that there has been no evidence of a duty or a standard of care for the provision and erection of guardrail subsequent to the initial

design and construction, but prior to the Cech accident of 11-29-74, and no evidence presented of a breach of any such duty by the Defendant. And further, that there has been no evidence of a standard of care or duty on behalf of the Defendant with regard to accident frequency ratio analysis for this highway in question. And further, that there has been no evidence showing any breach of duty or standard of care for the compilation and reporting of accidents data for this interstate 90 highway."

We note that this first specification of error is directed at the court's failure to direct a verdict on the question of the State's negligence to place a guardrail at the scene of the accident at the time the freeway was first designed and built. The motion did not go to the question of whether the State was negligent in failing to put a guardrail there later after there had been accidents in the area. With the uncontroverted expert testimony before it at that time, the court might well have directed a verdict on this very narrow issue. However, the court was not requested to direct a verdict for failing to put a guardrail in after the initial construction and design, so it was not in a position to direct or refuse to direct a verdict on this point. Therefore, we find no error.

The second issue, and the one we find necessitates the return of this case, was the admission of evidence of subsequent remedial measures taken by the State after the accident. The investigating officer of the Cech accident requested an emergency study of the area which went to the Spot Safety Unit of the Department of Highways. Approximately a month after the accident, after an investigation, a recommendation was made which resulted in the placement of a guardrail across the entrance of the recovery area. This construction was done subsequent to the Cech accident and was completed in 1975.

Over the State's objection, the court allowed evidence of this "subsequent request for an emergency study" to be admitted into evidence. The objection was based on Rule 407, Mont.R.Evid.:

"When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur,

evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment."

Plaintiff argues that the admission of other incidents is both relevant and material under the case law of Montana, citing *Leonard v. City of Butte* (1901), 25 Mont. 410, 65 P. 425, and *Robinson v. F. W. Woolworth Co.* (1927), 80 Mont. 431, 261 P. 253. We find neither case persuasive in view of the facts and law in this case.

In *Leonard* the question considered prior falls on a smooth sidewalk, some 100 reported falls in a year, 25 in the two months before plaintiff fell, all on a space of six feet square. The city had an ordinance requiring safe construction and reporting of any defects or accidents to the city. The case is an early Montana holding, and decided long before Rule 407, Mont.R.Evid., became effective. Also, there was a specific violation of a city ordinance involved. In addition, the case is not in point on whether an instruction, as given here, cured any prejudice.

The same objection can be made to *Robinson*, a slip and fall case in the Woolworth store. The objection raised was to the remoteness in time betweeen the various alleged falls, and this Court found that such a decision was within the sound discretion of the court. In addition, neither *Robinson* nor *Leonard* involved the issue now before us—construction done after an accident.

The State argues that it never took the position that installation of a guardrail was unfeasible; it never controverted any allegation of feasibility. Furthermore, there never was a question of ownership or control, and impeachment was not at issue. Therefore, contends the State, there was no ground on which the evidence was properly admitted.

The State claims that it was unduly prejudiced by the admission of the evidence relating to subsequent remedial measures and claims further that the jury was confused or misled in its delibera-

tions, having been allowed to consider such evidence. Because of that, the evidence should not have been admitted, for although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of prejudice, confusion of issues, or misleading the jury. Rule 403, Mont.R.Evid. The State charges that the introduction of evidence regarding the subsequent installation of a guardrail was plaintiff's attempt to show antecedent negligence on the part of the State, and was improper, citing *Frankel v. Burke's Excavating, Inc.* (E.D.Pa.1967), 269 F.Supp. 1007, 1011.

Plaintiff argues that even if this admission was error, it was cured by the instructions given the jury which allegedly cured any prejudice to the State. We do not agree.

Here, plaintiff was successful in getting before the jury the idea that the State, by constructing the additional guardrail at the scene of the accident, after the accident, is evidence which amounts to antecedent negligence. We hold that the admission of this evidence necessitates a new trial. See *Frankel v. Burke's Excavating, Inc.*, supra.

The rule in such cases is that where there is ample evidence of the conditions at the scene of the accident at the time of the accident, evidence of subsequent repairs and improvements by a highway department is not admissible for showing the condition at the time of the accident. A discussion in a Fifth Circuit Court decision is enlightening on this point. In *Louisville & Nashville Railroad Company v. Williams* (5th Cir. 1966), 370 F.2d 839, 843-44, the court said:

"The rule is well settled that evidence of subsequent repairs or improvements by a defendant altering the scene of an accident may not be admitted in evidence to show negligence on the part of the defendant. There was ample evidence in the present case of the condition of the crossing at the time of the collision, and we do not think that the evidence of subsequent repairs and improvements was admissible under the theory employed in *City of Montgomery v. Quinn*, 1944, 246 Ala. 154, 19 So.2d 529, 531-533, that is, to

show the condition existing at the time of the accident . . .

". . .

". . . here the subsequent changes did tend to the inference that the crossing was unusually hazardous and that the railroad company was negligent in not providing warnings other than those required by statute. However, Professor Wigmore makes it clear that the *controlling* ground for excluding evidence of repairs or improvements made after an accident is the argument of policy and that, if the policy purpose is obviated, the theory of relevancy may not be a sufficient ground of objection:

" 'To be sure, it may be argued that, on the general theory of Relevancy (ante, §§ 31, 38), it would suffice for admissibility if merely the inference was a fairly possible one,—leaving it to the opponent to argue that it was the less probable one. Theoretically, it would be perhaps difficult to deny this. But in the present instance an argument of Policy has always been invoked to strengthen the case for exclusion. That argument is that the admission of such acts, even though theoretically not plainly improper, would be liable to over-emphasis by the jury, and that it would discourage all owners, even those who had genuinely been careful, from improving the place or thing that had caused the injury, because they would fear the evidential use of such acts to their disadvantage; and thus not only would careful owners refrain from improvements, but even careless ones, who might have deserved to have the evidence adduced against them, would be refraining from improvements subject innocent persons to the risk of the recurrence of the injury.

" 'Whatever then might be the strength of the objection to such evidence from the point of view of Relevancy alone, the added considerations of Policy suffice to make clear the impropriety of resorting to it.' II Wigmore on Evidence, 3rd ed., § 283, pp. 151, 152."

The court declined to find an abuse of discretion on the part of the trial judge, declaring that because the highway department which made the repairs was not made a party to the suit, the policy ground for excluding the evidence was not applicable. In the

instant case, however, the party making the repairs is the party defendant, so the argument is easily made that the policy considerations are applicable.

Exceptions to the rule are articulated in the rule itself. Although evidence of subsequent remedial measures are generally not admissible because not probative of the issue of negligence, the evidence should be admitted if for another purpose. Here, however, there was no dispute as to the *ownership* of the site; no dispute as to under whose *control* it was; and no dispute as to the *feasibility* of the precautionary measure. The State maintains there was no question of *impeachment*, while plaintiff claims that the installation itself is impeachment of the State's allegation that it was not negligent in providing a recovery area. The discussion of federal cases in this area appears to contravene plaintiff's notion of "impeachment." As an aid to understanding, see the discussion of cross-examination which resulted in allowing evidence of subsequent remedial measures to be admitted under the impeachment exception in *Daggett v. Atchison, Topeka and Santa Fe Ry. Co.* (1957), 48 Cal.2d 655, 313 P.2d 557, 563, 64 A.L.R.2d 1283.

The judgment is reversed and the case remanded for a new trial.

MR. CHIEF JUSTICE HASWELL concurs.

MR. JUSTICE SHEEHY dissenting.

The majority opinion turns on the narrow issue that the District Court improperly admitted evidence that following the accident, the Highway Department installed a guardrail where plaintiff's automobile left the highway.

The majority opinion does not take into account the theory of defense advanced by the State during the trial, and the theory of recovery advanced by the plaintiff. It was the theory of the State that the highway was constructed in accordance with acceptable standards of the year 1967, when the original highway was built. The theory of the plaintiff was that the State had a duty to upgrade the safety standards of the highway by reason of experience after the highway was constructed; that the State had determined that in

this case a guardrail should be constructed; and that the State negligently failed to install a guardrail which might have prevented the fatalities and other injuries here.

A further statement of the facts is necessary to understand the precise issue that was submitted to the jury.

On November 29, 1974, the Cechs, Richard, the father, Arlene, the mother, and children Bruce, Kerry and Kelly were traveling west on Interstate 90, 11 miles west of Whitehall on a section of roadway called Cottonwood Hill near mile marker 259.8. Richard Cech was driving the automobile. The automobile, at a speed of 60 miles per hour (taking the evidence at its worst for the driver) passed from a dry section of the highway to an icy section on a shaded curve. The automobile went into a skid and the driver lost control. The automobile left the roadway, traveling to its right, off the highway, across a downsloping, icy plateau called a "recovery area" toward a deep ravine, into which the automobile rolled approximately 400 feet. The recovery area was grassy, covered by three to four inches of crusted snow.

At the time of the accident, guardrails protected this particular curve except for a portion of the curve approximately 600 feet in length. Through this gap of guardrail, the Cech traveled through the recovery area. The evidence showed that the automobile skidded 84 feet 2 inches on the oil mat of the highway, 378 feet 1 inch on the recovery area, and thence over the edge of the recovery area into the ravine where presumably the injuries occurred.

This section of the interstate was designed during the mid-1960's by the State Highway Department. The construction contract was let in 1968 and the four lane interstate was opened to the traveling public in the fall of 1970.

It was the contention of the State throughout the trial, that the design of the highway and guardrails or lack of guardrails was proper. The State contended there was a "recovery area" at the place of the gap in the guardrail; that this recovery area was safer for vehicles leaving the highway than was a guardrail; and the

presence of a guardrail where the gap existed would not have prevented the accident to the Cech automobile.

It was the contention of the plaintiff, and his evidence tended to prove, that after this portion of the interstate had been completed, the State had notice that this particular section of the roadway was dangerous when icy; that ice always accumulated during the winter months; that the lack of guardrail permitted vehicles to stray out upon the grassy slope designated as the "recovery area"; and that vehicles going out upon the recovery area would be unable to stop on the slope, and would go into the deep ravine. Further, plaintiff contended that while a guardrail would not have prevented the *accident*, it would have prevented the *injuries* which the Cechs received.

The State also contended that as an economic choice in the original design of the highway, and later maintaining it, the cost of guardrails as compared to the cost of providing a recovery area was a factor in its decision.

A look at the testimony will demonstrate the kind of evidence that was adduced by the State in support of its theory. David S. Johnson was called by the State. He is a professional engineer for the Highway Department. At the time of the trial he was the supervisor of engineering specialties for the Department.

Mr. Johnson testified:

"Q. Now with regard to the second page of Defendant's Exhibit I, would you look at that page of the document and tell me if you in your review of the design of this highway, and possibly [sic] others, for the State of Montana, would follow the information provided on that document? A. Yes, we would use this.

"Q. Generally what does that information relate to? A. It relates to the providing of clear recovery areas wherever you can on a highway.

"Q. Does it make a distinction in that document with regard to the median as opposed to the shoulder of the road recovery areas? A. Well, I don't see a reference to median in here, just offhand.

"Q. So it would be safe to say that that applies to recovery areas along the shoulders of interstate highways? A. Yes, I think so.

"Q. As a designer, and based upon your education and your experience in that field, is there a preference that you follow with regard to shoulder of the road areas, a preference that you take of recovery area over guardrail? A. Well, *it's always better to have a clear space where a vehicle can recover as opposed to having a guardrail,* which is something that a vehicle can run into.

"Q. Do you consider, as a designer, that guardrail is a hazard? A. Oh, definitely.

"Q. In your design of interstate highways would you prefer to have a recovery area built or a guardrail built. A. Well, as a designer, and as a driver, I would rather have the recovery area.

"Q. All right. On this area of Cottonwood Hill is there in the design of the interstate highway a design of recovery area? A. Yes, there is." (Emphasis added.)

In another instance, Ronald J. Hensen also testified for the State. He is a consulting engineer from Boulder, Colorado:

"Q. Do you have a term that you use in describing such an area on the shoulder of the road? A. Where they have been dressed down, such as in this particular area, they are referred to as a secondary recovery area.

"Q. *Is the use of a secondary recovery area an accepted practice in protecting a vehicle as it leaves the traveled way?* A. *Yes, it is.*

"Q. And is that method, the use of a recovery area, a primary or secondary safety feature with regard to protection on the shoulders? A. *Well, it's the primary objective in roadway design to provide a recovery area wherever possible,* such that a vehicle which inadvertently leaves the road has an opportunity to get itself back under control without impacting either another vehicle or a fixed object.

"Q. Is guardrail used for the protection at the shoulders of the road when a vehicle leaves the traveled way? A. *Guardrail is used in design as a secondary solution where the physical space*

*cannot be provided.* That is, where the topography is such that to provide additional space out there would be prohibitive in terms of total cost.

"Q. Now, are you suggesting that there are economic considerations for the use of recovery areas, as opposed to guardrail? A. Well, there are economic considerations in the design of roadways. And the basic economics of this, there has to be some trade off between how many miles of roadway can be improved versus how safe they can be made. The ultimate end of it is on one end you merely provide space for a vehicle to move, and on the opposite end you make it crash proof such that no matter what a driver would do he would be protected from himself." (Emphasis added.)

The foregoing evidence demonstrates the posture of the State, that recovery areas were safer than guardrails, more economical, and within the standards. In contrast to that evidence, the plaintiff produced an interoffice memorandum dated December 10, 1974, in which the manager of the traffic unit of the Highway Department reported to the Administrator of the Highway Department in part as follows:

". . . We have made an accident analysis run from the H.I.S. System and according to the information obtained, there have been five accidents (plus these two) which have happened in this area in the time period of January 1, 1972 to November 11, 1974. The exact location of these accidents is in the westbound lane, milepost 259.9.

"This area has a shaded spot which gets very slippery at times in the winter. When vehicles lose control and go into the ditch they are in trouble because they can slide behind the shoulder guardrail and into a hole which is at least 100 feet deep. This situation could very easily be fixed by adding about 600 feet of guardrail which would connect to the guardrail on both ends. There is now a safety project which is under construction in this area and guardrail is bid at $2.75 a foot. Therefore, we feel this guardrail should be added to the project."

The evidence also showed that eventually the 600 feet of guard-

rail was installed by the Department, after the Cech accident at a cost to the State of approximately $145, disregarding the federal contribution.

How, in the light of the foregoing testimony, can the majority state that there is no issue of feasibility nor of impeachment which would permit evidence of the subsequent remedial measures taken by the State in installing the guardrail?

In *Raybell v. State* (1972), 6 Wash.App. 795, 496 P.2d 559, the Washington court found the duty applying to a municipality to maintain adequate protective barriers where such barriers are shown to be practical and *feasible*. The court commented that the *feasibility* of such a guardrail was shown by the fact that the State later installed one in the location of the accident.

The interdepartmental memorandum, which we have quoted said the dangerous situation "could very easily be fixed" by adding about 600 feet of guardrail. This is further proof of feasibility.

Under Rule 407, Mont.R.Evid., the subsequent installation was also admissible for impeachment. The State contended that the so-called recovery area was preferable to guardrail and its experts contended that the absence of a guardrail conformed in every way with acceptable standards so as to refute negligence. They also indicated that economically the recovery areas were preferable to guardrails. We have earlier decided in *Lawlor v. County of Flathead* (1978), 177 Mont. 508, 582 P.2d 751, that repair of a chuckhole by the county two days after an accident occurred was admissible to establish feasibility of repair, and to impeach the testimony given by a county road foreman.

The point on which this decision turns should be governed by the appellate rule that the question of admissibility of evidence must in every case be left largely to the sound discretion of the trial court, subject to review only in case of manifest abuse. *Gunderson v. Brewster* (1970), 154 Mont. 405, 466 P.2d 589.

I would sustain the judgments.

MR. JUSTICE DALY concurs in the dissent.

MR. JUSTICE SHEA specially concurring.

I would reverse the judgment, but not for the reasons stated. Rather, I would reverse because the jury, in finding for the plaintiffs, clearly refused to apply an instruction upon which plaintiffs' right to recovery was predicated. Instruction no. 24 stated:

"In order to prove its case against Defendant, Plaintiff must show that the *design and construction of guardrail* on the Interstate Highway at the scene of the accident *was done negligently* and that such negligence was a proximate cause of the plaintiff's injuries." (Emphasis added.)

By this instruction, the jury could not find for the plaintiffs unless the evidence established that the design and construction of guardrail was deficient and the proximate cause of the injuries sustained. But plaintiffs' theory in the briefs and in oral argument is based upon a total absence of guardrail at a place where it should have been. I fail to see under these circumstances, how the jury verdict can stand, when the jury, in order to find for the plaintiffs, would have had to ignore this instruction, which of course, it had no right to do.

For this reason, I would reverse the judgment and order a new trial. I am also of the opinion that a different judge should be substituted for the retrial, something that should be done in all cases where a new trial is ordered.