No. 03-643

IN THE SUPREME COURT OF THE STATE OF MONTANA

2004 MT 116

STEVAN W. PAPICH and MARY LOU PAPICH,

Plaintiffs and Appellants,

v.

QUALITY LIFE CONCEPTS, INC.,
a Montana Corporation,

Defendant and Respondent.

APPEAL FROM:     District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause No. BDV-00-879
Honorable Julie Macek, Presiding Judge

COUNSEL OF RECORD:

For Appellants:

Alexander (Zander) Blewett, III, Christopher D. Meyer; Hoyt &
Blewett, Great Falls, Montana

For Respondent:

Maxon R. Davis; Davis, Hatley, Haffeman & Tighe, Great
Falls, Montana

Submitted on Briefs:  January 27, 2004

Decided:  May 4, 2004

Filed:

_____
                                        Clerk

Chief Justice Karla M. Gray delivered the Opinion of the Court.

¶1    Stevan W. Papich and Mary Lou Papich (the Papiches) filed suit against Quality Life Concepts, Inc. (QLC) in the Eighth Judicial District Court, Cascade County, alleging they suffered injuries as a result of QLC's negligent failure to control A.M., a developmentally disabled person.  A jury found QLC was not negligent and the District Court denied the Papiches' motion for a new trial and to alter or amend the judgment.  The Papiches appeal. We affirm.

¶2    We restate the issues as follows:

¶3    1.  Did the District Court manifestly abuse its discretion in denying the Papiches' motion for a new trial?

¶4    2.  Does sufficient evidence support the jury's finding that QLC was not negligent?

BACKGROUND

¶5    On November 5, 1997, Stevan W. Papich, an employee of the Easter Seal vocational day program in Great Falls, Montana, was preparing to take a van full of developmentally disabled consumers on a day program outing.  He heard A.M., the passenger sitting immediately behind him, say something.  Papich turned in his seat to ask A.M. what he wanted, and A.M. punched Papich in the eye.  The punch broke Papich's eyeglasses and caused the retina in his left eye to detach.

¶6    A.M. was 51 years old at the time, but had the mental age of a 4-year-old and an IQ of less than 40.  Since 1983, he had lived in a group home operated by QLC, a nonprofit

2

corporation which contracts with the Montana Department of Public Health and Human Services (DPHHS) to provide services for developmentally disabled persons.

¶7　　The Papiches filed this action in District Court alleging that QLC negligently failed to prevent A.M. from hurting others, resulting in Stevan's loss of eyesight and other damages and loss of consortium for Mary Lou. Before trial, the District Court granted the Papiches' request to exclude any evidence of negligence by Easter Seal, which has tort immunity under the Workers' Compensation Act. The court also ruled QLC had a special relationship of custody and control over A.M. and, as a result, had a legal duty of care to those placed within the foreseeable zone of risk created by any breach of that duty. *See Lopez v. Great Falls Pre-Release Services, Inc.*, 1999 MT 199, 295 Mont. 416, 986 P.2d 1081, and *LaTray v. City of Havre*, 2000 MT 119, 299 Mont. 449, 999 P.2d 1010.

¶8　　At trial, the Papiches testified about their injuries. They also presented Stevan's and others' testimony about prior incidents in which A.M. had been sexually or physically aggressive toward other persons. Expert witnesses supported the Papiches' position that QLC breached its duty of care by, among other things, failing to properly medicate A.M. with the behavioral medication Depakote, and that the breach caused the Papiches' injuries. QLC presented testimony by lay and expert witnesses supporting its position that it did not breach its duty of care and met that duty through staffing and services provided to A.M., using behavioral modification programs, consulting with medical professionals, and communicating with Easter Seal and DPHHS regarding what was happening in A.M.'s life.

3

¶9 At the end of the four-day trial, the District Court gave the jury a special verdict form on which the first question asked "Was Defendant Quality Life Concepts, Inc., negligent?" The jury was instructed to answer additional questions on the special verdict form only if it answered the first question "yes." The jury answered "no" to the negligence question, thereby ending its deliberations. The District Court subsequently entered judgment dismissing the Papiches' action.

¶10 Thereafter, the Papiches filed a combined motion for a new trial and an altered or amended judgment pursuant to Rule 59, M.R.Civ.P. They argued that, at trial, QLC repeatedly and deliberately violated the pretrial order prohibiting it from presenting any evidence of Easter Seal's negligence. The Papiches also moved the court to alter or amend the judgment and determine that QLC was negligent as a matter of law, based on: (1) admissions by QLC's former chief executive officer, Charles Trott; (2) testimony of Dr. Patrick Galvas, a physical medicine and rehabilitation physician who had reviewed A.M.'s records, and opined that, as early as 1994, a behavioral modification program, behavioral medications and movement to a more secure and structured living facility should have been implemented to prevent A.M. from hurting others; and (3) testimony by Drs. John Mendenhall, a psychiatrist who had treated A.M. from September of 1997 to September of 1998, and Jack Hornby, a psychiatrist who treated A.M. from November of 1998 through the time of trial, concerning medication for A.M. After QLC responded, the District Court denied the Papiches' motion.

4

¶11    The Papiches appeal. On appeal, they make no argument concerning the testimony of Dr. Galvas. Moreover, because they do not expressly argue their motion to alter or amend the judgment, we do not address it.

ISSUE ONE

¶12    Did the District Court manifestly abuse its discretion in denying the Papiches' motion for a new trial?

¶13    Rule 59(a), M.R.Civ.P., allows a district court to grant a new trial "for any of the reasons provided by the statutes of the state of Montana." Section 25-11-102, MCA, lists causes which, if they materially affect the substantial rights of a party, may be grounds for new trial; the list includes "irregularity in the proceedings . . . by which either party was prevented from having a fair trial." Section 25-11-102(1), MCA. A decision on whether to grant a new trial is committed to the sound discretion of the trial judge and will not be disturbed without a showing of manifest abuse of that discretion. *Durden v. Hydro Flame Corp.*, 1998 MT 47, ¶ 30, 288 Mont. 1, ¶ 30, 955 P.2d 160, ¶ 30 (citations omitted).

¶14    The District Court's pretrial ruling prohibited any evidence of negligence on the part of Easter Seal, Stevan Papich's employer. The Papiches proposed--and the District Court gave--an instruction directing the jury not to consider the conduct of the State of Montana or Easter Seal "for any purpose whatsoever" in determining whether QLC was negligent.

¶15    The Papiches contend counsel for QLC nevertheless "blamed" Easter Seal for the injury to Stevan Papich. They argue that this constituted serious attorney trial misconduct and advance *Durden* and *Lopez v. Josephson*, 2001 MT 133, 305 Mont. 446, 30 P.3d 326,

5

as cases in which we have condemned serious attorney trial misconduct because it prevents opposing litigants from having a fair trial.

¶16    *Durden* was a product liability action against the manufacturer of a trailer furnace which the plaintiffs claimed allowed carbon monoxide to enter the plaintiffs' trailer. There, we affirmed the district court's decision to grant a new trial because defense counsel had referred at trial to "a litany" of topics not material or relevant to the issues or not substantiated by competent expert testimony--including the plaintiffs' religious beliefs and practices and marital problems. *Durden,* ¶¶ 31, 37. *Lopez* was a civil action for assault. There, we ordered a new trial where plaintiffs' counsel had repeatedly asked objectionable questions and raised impermissible inferences, including repeated references to a notarized statement which the court had ruled inadmissible. *Lopez*, ¶ 48.

¶17    The Papiches' brief lists occasions on which counsel for QLC queried witnesses about the interaction of QLC and Easter Seal staffs in providing services for A.M., specifically concerning the individual planning (IP) process. In the IP process, a team--including the developmentally disabled consumer, the day program (here, Easter Seal), the residential program (here, QLC), a DPHHS representative and any other interested parties--meets at least yearly to come to a consensus on goals and objectives for the consumer for the coming year. The Papiches contend QLC violated the pretrial order prohibiting evidence of Easter Seal's negligence by asking questions about the IP process during its cross-examination of Stevan Papich and its direct examination of both Lynn Morley, QLC's community support and services director, and Lori Wertz, a DPHHS quality assurance representative. They also

6

contend QLC's counsel violated the ruling by referring to the IP process during closing argument:

> And I think you've heard from the State people, Carol LaRocque and Lori Wertz; you've heard from an ex-Easter Seal employee, Ms. Derenberger. [QLC] met that duty by trying to bring as much information to the table so informed decisions could be made about what to do with [A.M.], could be made by the team, of which [QLC] was a participant. You heard Ms. Wertz say that that's how those decisions are made, in this IP process.

¶18 The Papiches' argument that QLC's questions and argument relating to the IP process violated the court's pretrial ruling and constituted serious attorney trial misconduct is disingenuous. The Papiches asked their very first witness, Stevan Papich, about the IP process. Counsel questioned Papich about his authority to make decisions regarding A.M., and Papich replied that his supervisors at Easter Seal, A.M.'s doctors, staff at QLC and the IP team had such authority. He then went on to describe the IP decision-making process and indicated he had participated in at least one IP meeting concerning A.M.

¶19 In short, both parties presented evidence about the IP process. In neither *Durden* nor *Lopez* did the party objecting to evidence as inadmissible under a pretrial order also offer evidence on that same subject, as the Papiches did on the IP process. The Papiches opened the door regarding the IP process and, on that basis alone, *Durden* and *Lopez* are distinguishable.

¶20 In any event, however, evidence about the IP process does not equate to evidence of negligence by Easter Seal. Negligence means breach of a legal duty resulting in actual loss or damage. *Geiger v. Department of Revenue* (1993), 260 Mont. 294, 297-98, 858 P.2d

7

1250, 1252 (citation omitted). Our review of the record convinces us that none of the evidence the District Court admitted concerning the IP process violated the court's prohibition of evidence of negligence by Easter Seal. In fact, the record is devoid of any indication QLC was attempting to establish that any breach of legal duty by Easter Seal led to the Papiches' injuries.

¶21 The Papiches also argue entitlement to a new trial because of testimony concerning a line on the pavement at the Easter Seal facility. In examining QLC employee Morley, QLC's counsel asked:

> Q: Could you just send your folks right out to Easter Seal, to go out there and monitor people like [A.M.]?
>
> A. Well, we were allowed by Easter Seal to come if there was an issue. Very rarely was it ever agreed upon that QLC staff would come out and work directly in the Easter Seal facilities.
>
> Q. Was there some kind of line in the pavement?
>
> A. Yes, sir, there was.
>
> Q. What was the line on the pavement?
>
> A. Well, traditionally in services for people with disabilities, the day program and the residential program don't get along and--
>
> Q. Is that the case here?
>
> A. More often than not, yes. So and so didn't clean up this mess, and then this is your responsibility.
> So there was a line painted on the concrete, and it was agreed upon-- this was at Easter Seal at the entrance. And when those QLC vans pulled up, and dropped those clients off, once those clients crossed that line, they became Easter Seal's responsibility. QLC staff didn't cross over. Then there was no

8

confusion as to who should be escorted to take the coats off, and who should be putting lunches away, and how the medication was exchanged.

And so it was an attempt at that point in time to eliminate staff confrontation and errors.

At that point, the Papiches objected that the court's pretrial ruling excluded evidence of Easter Seal's negligence, and the District Court overruled the objection. QLC's counsel then elicited testimony that the line in the pavement no longer existed at the time of trial, but that even when the line existed, QLC tried to communicate as fully as possible with Easter Seal and that the IP process was the forum for brainstorming about a consumer. The Papiches point to that testimony, too, stating "[w]ith that testimony, QLC 's counsel firmly impressed upon the jury that A.M.'s IP team functioned within the context of Easter Seal having *sole* responsibility for A.M. when he crossed the painted line at Easter Seal."

¶22    The Papiches contend the above exchange amounts to serious attorney trial misconduct such as that condemned in *Durden* and *Lopez.* Unlike the evidence in *Durden* and *Lopez,* however, the evidence about the line in the pavement was relevant. The topic was raised in the context of QLC's communications with Easter Seal. According to Morley, the line on the pavement represented a limit on QLC's ability to monitor A.M. Thus, the testimony related to a limitation on QLC's authority, not to fault on the part of Easter Seal.

¶23    On appeal, but not in the District Court, the Papiches further argue they were entitled to a new trial on grounds that the District Court abused its discretion in admitting the above-referenced evidence, which they say prejudiced their case. They point out that erroneous admission of prejudicial evidence, if likely to confuse a jury about an important issue,

requires a new trial. *Unmack v. Deaconess Medical Center*, 1998 MT 262, 291 Mont. 280, 967 P.2d 783; *State v. Ingraham*, 1998 MT 156, 290 Mont. 18, 966 P.2d 103; *Cech v. State* (1979), 183 Mont. 75, 598 P.2d 584. The Papiches compare the effect of the evidence regarding the IP process and the line on the pavement with the evidence improperly admitted in *Unmack*, *Ingraham*, and *Cech*.

¶24 In *Unmack*--a medical malpractice case--we determined inadmissible impeachment evidence concerning the legal negligence of an expert medical witness who was both a doctor and a lawyer required a new trial. *Unmack*, ¶ 17. In *Ingraham*, we held that the trial court erred in admitting evidence of drugs found in both the criminal defendant's blood and his urine when there was no evidence that the drugs had impaired his driving. *Ingraham*, ¶ 51. In *Unmack* and *Ingraham*, the disputed evidence was not relevant. *See Unmack*, ¶ 14; *Ingraham*, ¶ 46. As discussed above, that is not the case here. Both parties presented evidence about the IP process, and the testimony regarding the line on the pavement was relevant to a limit on QLC's ability to monitor A.M.

¶25 *Cech* was a negligence case against the State of Montana by plaintiffs whose vehicle had skidded and crashed on a Montana highway. We reversed a jury verdict for the plaintiffs because the district court had admitted evidence of subsequent remedial measures undertaken by the state. *Cech*, 183 Mont. at 82, 598 P.2d at 588. Unlike *Cech*, there is no issue concerning subsequent remedial measures in this case.

¶26 On the record before us, we hold the District Court did not manifestly abuse its discretion in denying the Papiches' motion for a new trial.

10

¶27 Does sufficient evidence support the jury's finding that QLC was not negligent?

¶28 The Papiches urge that evidence of QLC's negligence was overwhelming and undisputed. They contend the evidence does not support the jury's verdict in QLC's favor.

¶29 A jury's verdict which is challenged as not supported by the evidence may be overturned only in the complete absence of any credible evidence to support the verdict. All evidence and all inferences drawn from the evidence must be considered in a light most favorable to the adverse party and, if conflicting evidence exists, the credibility and weight given to the evidence is within the province of the jury and will not be disturbed unless the jury's findings are inherently impossible to believe. *Campbell v. Canty*, 1998 MT 278, ¶ 19, 291 Mont. 398, ¶ 19, 969 P.2d 268, ¶ 19 (citations omitted).

¶30 The Papiches contend QLC chief executive Trott admitted QLC's negligence when he testified he believed A.M. had the right to make any and all decisions for himself, including decisions about his health care. We disagree.

¶31 A judicial admission is an express waiver made in court by a party or his attorney conceding the truth of an alleged fact. For a judicial admission to be binding, it must be an unequivocal statement of fact and not the expression of an opinion or a legal conclusion. *DeMars v. Carlstrom* (1997), 285 Mont. 334, 337, 948 P.2d 246, 248-49 (citations omitted). Our review of the record here indicates that, aside from being, at best, only indirectly related to the question of negligence by QLC, Trott's statement of belief that A.M. had the right to make decisions for himself constituted the expression of an opinion, and not an admission

of negligence. Furthermore, Trott later elaborated that A.M.'s IP team was the appropriate forum for discussion of whether to seek a referral for medication to control A.M.'s behavior.

¶32 According to the Papiches, QLC negligently failed to provide A.M. with therapeutic levels of Depakote, a behavioral medication. Dr. Mendenhall had first prescribed 500 milligrams of Depakote per day for A.M. in October of 1997, about a month before A.M. punched Stevan Papich. He increased the dosage to 1000 milligrams per day in January of 1998. Dr. Mendenhall also testified he was shown reports concerning incidents involving A.M. in 1996--before he began treating A.M.--and that if he had been treating A.M. at that time, he would have prescribed behavioral medication. The Papiches also cite Dr. Hornby's testimony that he had continued the Depakote at the higher dose since he replaced Dr. Mendenhall as A.M.'s psychiatrist in November of 1998, approximately a year after the incident at issue.

¶33 Dr. Hornby also testified, however, that the Depakote did not--and could not be expected to--eliminate all of A.M.'s aggressive behaviors. He testified, "None of these medicines eliminate aggressive behavior. As human beings, under the right circumstances, any of us can become aggressive or out of control." Thus, the testimony of Dr. Hornby undercuts the Papiches' position that earlier and higher dosage administration of Depakote would have prevented A.M. from punching Stevan Papich, and supports the jury's verdict.

¶34 Furthermore, in relation to their argument that QLC failed to provide A.M. with therapeutic levels of Depakote, the Papiches did not offer an instruction that QLC had a duty to medicate A.M. An argument that, despite the jury's verdict, such a duty was somehow

12

implicit in QLC's duty of reasonable care invites re-weighing the evidence, which is outside the scope of our review. As stated above, a jury verdict may be overturned only in the complete absence of any credible evidence to support it. *See Campbell*, ¶ 19.

¶35 The District Court instructed the jury that QLC had a "duty to exercise reasonable care to prevent [A.M.] from doing bodily harm to other persons." Substantial credible evidence supports the jury's verdict that no breach of that duty occurred.

¶36 In addition to the evidence concerning behavioral medication, the jury received both testimonial and documentary evidence that, beginning two months before the incident at issue here, QLC employed a new behavioral modification program to decelerate A.M.'s aggressive behaviors, including hitting. The jury heard testimony from two persons familiar with A.M.--one employed by DPHHS and one employed by Easter Seal--to the effect that QLC took adequate steps to prevent the consumers it served, including A.M., from injuring third parties. Several witnesses testified that A.M. was not the most aggressive client served by QLC or Easter Seal, and that the staffs of both programs--including Stevan Papich--had protocols for dealing with aggression from clients, which was part of their jobs. QLC also presented evidence that it communicated information to others involved with its consumers through incident reports, daily logs, and a 24-hour call system.

¶37 Several witnesses, including Dr. Hornby, testified A.M. was not a suitable candidate for institutionalization, which was the only living situation suggested that would result in his being removed from the Easter Seal day program. Easter Seal employee Derenberger testified that everyone who worked with A.M. at Easter Seal was aware that A.M. could

13

strike out; she also testified she could think of no failure by QLC to communicate concerning A.M. Wertz, the DPHHS quality assurance representative, testified she "[did] not have any issues with the way QLC did business" regarding A.M.

¶38 We conclude that, when viewed in the light most favorable to QLC, the record clearly includes sufficient credible evidence to support the jury's finding that QLC was not negligent. Therefore, we hold the District Court did not abuse its discretion in denying the Papiches' motion for new trial and an altered or amended judgment.

¶39 Affirmed.

/S/ KARLA M. GRAY

We concur:

/S/ JAMES C. NELSON
/S/ JIM REGNIER
/S/ PATRICIA O. COTTER
/S/ W. WILLIAM LEAPHART