No. 03-509

IN THE SUPREME COURT OF THE STATE OF MONTANA

2005 MT 219

STATE OF MONTANA,

        Plaintiff and Respondent,

   v.

CHERYL IRISH CLIFFORD,

        Defendant and Appellant.

APPEAL FROM:    The District Court of the First Judicial District,
                   In and For the County of Lewis and Clark, Cause No. CDC 2001-104,
                   Honorable Thomas C. Honzel, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

                Palmer A. Hoovestal, Hoovestal, Kakuk & Fanning, PLLC,
                Helena, Montana

        For Respondent:

                Honorable Mike McGrath, Attorney General; Mark W. Mattioli,
                Assistant Attorney General, Helena

                Robert Deschamps III and Kirsten LaCroix, Special Lewis and Clark
                Deputy County Attorneys, Missoula, Montana

                           Submitted on Briefs:  January 11, 2005

                                 Decided:  September 6, 2005

Filed:

_____
                             Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1 The jury found Cheryl Clifford (Cheryl) guilty of tampering with or fabricating physical evidence in violation of § 45-7-207, MCA (1995), and threats and other improper influence in official and political matters in violation of § 45-7-102(1)(a)(ii), MCA (1999). Cheryl appeals various evidentiary decisions. We affirm.

## PROCEDURAL BACKGROUND

¶2 The State filed an information charging Cheryl with four offenses. Count One charged Cheryl with tampering with or fabricating physical evidence in violation of § 45-7-207, MCA (1995), because she sent letters to members of the Church of Jesus Christ of Latter Day Saints (the Church) and others intending to mislead law enforcement officers in their investigation. The State filed the second, third, and fourth charges against Cheryl for threats and other improper influence in official and political matters in violation of § 45-7-102(1)(a)(ii), MCA (1999). Count Two charged Cheryl with placing posters in East Helena, Montana, intending to influence East Helena Police Department (EHPD) chief, Mac Cummings, by threatening to harm persons at Capital High School; residents at 302 Clark Street, East Helena; and EHPD officials. Count Three charged Cheryl with sending .38 Special cartridges to the EHPD intending to influence Cummings. Count Four charged Cheryl with sending a letter to Officer Deborah Drynan to improperly influence her by threatening her and her children. The jury found Cheryl not guilty of the second and third counts, but guilty of the first and fourth counts.

## FACTUAL BACKGROUND

2

¶3 In 1991, Cynthia Hurst and her three children, Daniel, Kalina, and Wesley, moved from New Mexico to East Helena. During the next year, some missionaries from the Church came proselytizing to her door. By May 1992, she had joined the Church. Cheryl and Larry Clifford were also members. Cheryl was a process server and private investigator, and Larry was an officer at the EHPD. The Cliffords had two living children, Megan and Lance.

¶4 While the missionaries were encouraging Hurst to join the Church, Hurst began leaving her children with her friend, Charles Scott. Charles Scott lived with his twenty-four-year-old son, Michael Scott. At first, Hurst took the children to Charles's house because they had chicken pox, and could go neither to school nor to daycare. Later, the children wanted to go over there to "play Nintendo." Charles and Hurst would let them stay the night. Over the course of a year and a half, the children went to Charles's house about a dozen times.

¶5 In 1994, Hurst's son, Daniel, called Hurst from school and cried as he told her that Michael Scott had been molesting him. Hurst filed charges with the EHPD, where Larry was on duty. During the investigation phase, Cheryl called Hurst and told her the police were going to charge Hurst because Hurst knew that Michael Scott was a child molester when Hurst left her children with him. In November 1995, the court sentenced Michael Scott to forty years in prison.

¶6 Larry was upset that the Deputy County Attorney would not charge Hurst for failing to protect her children. That November, in his capacity as a police officer, Larry filed a complaint against Hurst for negligent endangerment under § 45-5-208, MCA (1995). The

Church helped Hurst hire a lawyer, who successfully moved the court to dismiss the charges because the statute of limitations had run.

¶7 For the present case, the District Court admitted over seventy letters, but many more were received. Bradley Peterson was a Bishop in the Church. In October 1996, the first letter arrived at his personal residence. During the next four years, letters bearing the same scrawling script arrived at the homes of members of the Church and the Cliffords, the Helena Independent Record newspaper, the EHPD, the Montana Highway Patrol, and Officer Drynan's office. The letters were vicious and lascivious, gory and disturbed, and twisted and disgusting. Some of the letters contained adult pornography and sexually explicit and threatening messages reminiscent of horror films. *Inter alia*, the letters threatened the defendant, Cheryl; her daughter, Megan; Bishop Peterson of the Church; and the police. If the sender had licked the envelopes or the stamps, authorities could have used DNA testing on the saliva, but the perpetrator sealed the envelopes with tape and used self-adhesive stamps. These methods led law-enforcement officers to believe that the sender may have been especially sophisticated about forensic techniques.

¶8 In early March 2000, William Cordes was working for the Criminal Investigation Bureau (CIB). The United States Secret Service had given him questioned-documents-examination training, and he had worked on document investigation cases in the past. The CIB chief had assigned him to this case. After bringing himself up to speed and reading the reports, Cordes decided to interview Cheryl and Larry. The Cliffords showed Cordes two fairly recent letters they said they had received in the mail. One of the envelopes had a

postmark with a small "tx" constituting the only legible word on the postmark. The other had a "2 JAN" postmark from "LYkES" "SC." Both of the envelopes had the suspicious writing similar to the writing that appeared on the other letters. Instead of giving the letters to Cordes, the Cliffords made copies for him on their fax machine.

¶9 In his application for a search warrant of the Cliffords' house, Cordes testified that three of the letters contained references to the Cliffords, Cheryl claimed to have seen *Hustler* magazine pages in the ditch along a major Helena street while she was driving at 6:30 p.m. during the winter, a search warrant executed at the Hurst residence revealed no evidence connecting the Hursts to the letters, and the Cliffords had been extremely vocal in accusing Daniel and his parents of writing the letters. The Cliffords had an envelope from "LYkES, SC." Upon contacting the nearest post office, Cordes discovered that Lykes is an abbreviation for Lykesland, which is the name for an unincorporated voting district. Neither "Lykes" nor Lykesland have post offices. The Cliffords had told Cordes that Daniel was in Army training in South Carolina at the time the letter was mailed. Based on this evidence, Cordes contended that probable cause existed to search the Cliffords' residence. A district court issued a search warrant for the Cliffords' house.

¶10 On March 14, 2000, Cordes and three other agents searched the Cliffords' house. Inside, one of the agents found two stamp kits with individual rubber characters for making stamps. One of the kits had all the characters still glued and connected. The other had all the characters still glued together, except: 'L,' 'Y,' 'k,' 'E,' 'S,' '2,' 'J,' 'A,' 'N,' 'X,' and ',.'.

¶11    Following the search of the Cliffords' house, only one more letter arrived. A year after the search, in March 2001, a churchgoer received a letter marked "Return to Sender" with the same scrawled handwriting.

¶12    The Lewis and Clark County Sheriff's Office first contacted James Blanco about this case in December 1998. Blanco is one of about 150 experts in the United States and Canada certified by the American Board of Forensic Document Examiners. This is the only certification recognized by crime laboratories in the majority of governmental agencies, including the United States Secret Service; the Internal Revenue Service; and the Bureau of Alcohol, Tobacco, Firearms, and Explosives. In his first of five reports, Blanco could neither identify nor eliminate Cheryl, Larry, or Daniel as writers of the anonymous letters. After the search of the Cliffords' house, Cordes sent Blanco another batch of documents to analyze for the writer's identity. This time, Blanco had more success. He identified Cheryl as the author of the Lykes envelope and the author of the "tx" envelope. In his final three reports, Blanco identified Cheryl as having written even more of the suspicious letters and envelopes.

¶13    To support the motion to file the information, the State's affidavit set forth, *inter alia*, Cheryl's and Larry's occupations and membership in the Church, details about the Michael Scott sexual molestation case, Larry's issuance of the negligent endangerment complaint, and the subsequent commencement of the letters. The affidavit described Cordes enlisting Blanco and Blanco's conclusions that Cheryl authored many of the letters. Further, it recited that John Wardell, who was also a member of the Church, had been delivering a small

cargo container to the Hurst residence when he saw a vehicle driving by that looked exactly like a vehicle the Cliffords owned. Two days later, Wardell's daughter received a handwritten mailing referencing Wardell's trip to the Hurst residence.

¶14 The affidavit asserts that the Lewis and Clark Sheriff's Office had searched the Hurst residence years earlier, when they suspected Daniel, but had found no incriminating evidence there. It recounts the many instances in which Blanco identified Cheryl as having written various letters including the ones sent to the Montana Highway Patrol, the Lewis and Clark County Sheriff's Office, and the Helena Independent Record newspaper. The affidavit also states that, in April 1999, Larry found a greeting card and a flower on Megan's car windshield, and the Helena Police Department traced the card to Van's Thriftway. Owner-clerk Paula VanderJagt picked Cheryl out of a six-woman lineup as the card's purchaser. Based on these allegations, the District Court granted leave to file informations against Cheryl and Larry Clifford in May 2001.

¶15 In November 2001, Cheryl's and Larry's lawyers took Blanco's deposition. Blanco came prepared to give representative details of the methods of analysis by which he concluded that Cheryl had authored various letters, but he was not prepared to explain every detail of every comparison between the letters. At trial, Blanco had overhead projections and blown-up trial exhibits comparing the distinctive elements of the characters in the letters.

¶16 After the State rested, Cheryl moved for a directed verdict, contending that Blanco's testimony was the only concrete evidence, and it was insufficient as a matter of law to convict her. The District Court denied the motion. In presenting her defense, Cheryl

intended to call Mark Denbeaux as a handwriting expert. The State objected, and the District Court excluded him.

¶17 We restate the issues Cheryl raises as follows:

¶18 1. Whether Rule 702, M.R.Evid., required a *Daubert v. Merrell Dow Pharms., Inc.* (1993), 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469, hearing before admitting Blanco's testimony.

¶19 2. Whether the affidavit accompanying the motion to file the information had inadequate probable cause upon which to file the information.

¶20 3. Whether the State failed to provide Blanco's reasons for concluding that Cheryl authored the documents so a continuance became necessary.

¶21 4. Whether Blanco's opinion testimony was sufficient as a matter of law to connect Cheryl and the questioned documents.

¶22 5. Whether Rule 702, M.R.Evid., requires the admission of expert testimony that handwriting evidence lacks reliability.

¶23 6. Whether Rule 404(b), M.R.Evid., requires the admission of particular evidence linking Daniel Hurst to the threatening letters.

¶24 7. Whether Cordes misrepresented the facts in his search warrant application for the Cliffords' house, so *Franks v. Delaware* (1978), 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667, required suppression of the evidence obtained in that search.

## STANDARDS OF REVIEW

8

¶25    This Court reviews a district court's evidentiary rulings for abuse of discretion. *State v. Cameron*, 2005 MT 32, ¶ 14, 326 Mont. 51, ¶ 14, 106 P.3d 1189, ¶ 14.  This Court reviews district court decisions on motions to continue to determine whether the district court abused its discretion. *State v. DeMary*, 2003 MT 307, ¶ 24, 318 Mont. 200, ¶ 24, 79 P.3d 817, ¶ 24.  This Court reviews district courts denials of motions to suppress to determine whether the district court's findings of fact are clearly erroneous and whether the district court's interpretation and application of the law is correct. *State v. Minez*, 2004 MT 115, ¶ 16, 321 Mont. 148, ¶ 16, 89 P.3d 966, ¶ 16.

## DISCUSSION

### I. Rule 702, M.R.Evid.

¶26    Cheryl argues that, since Blanco, in his deposition, could explain neither how nor why he concluded that Cheryl authored the documents, the District Court should have held a hearing pursuant to *Daubert* and *Kumho Tire Co. v. Carmichael* (1999), 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238.

¶27    Rule 702, M.R.Evid., provides as follows:

> **Testimony by experts.**
> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

9

*A. Daubert/Kumho Tire Co. Hearing*

¶28 Questions concerning expert testimony's reliability are threefold under Rule 702, M.R.Evid.: (1) whether the expert field is reliable, (2) whether the expert is qualified, and (3) whether the qualified expert reliably applied the reliable field to the facts. First, the district court determines whether the expert field is reliable. Second, the district court determines whether the witness is qualified as an expert in that reliable field. If the court deems the expert qualified, the testimony based on the results from that field is admissible—shaky as that evidence may be. Third, the question whether that qualified expert reliably applied the principles of that reliable field to the facts of the case is not a question for the trial court to resolve. Instead, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596, 113 S.Ct. at 2798, 125 L.Ed.2d at 484; *contra* Fed. R. Evid. 702(3) (giving trial courts the decision whether the qualified expert witness reliably applied the reliable field to the facts).

¶29 The *Daubert* test helps determine the reliability of a field of expert methods. 509 U.S. at 592, 113 S.Ct. at 2796, 125 L.Ed.2d at 482; *accord State v. Moore* (1994), 268 Mont. 20, 41, 885 P.2d 457, 470. In *Daubert*, the United States Supreme Court adopted a four-factor test, of which the factors are neither necessary nor sufficient to determine whether the field of scientific evidence that the expert is proposing is reliable. 509 U.S. at 592-95, 113 S.Ct. at 2796-98, 125 L.Ed.2d at 482-84; *accord Moore*, 268 Mont. at 41, 885 P.2d at 470-71.

The Supreme Court expanded this test to cover technical or other specialized expert testimony. *Kumho Tire Co.*, 526 U.S. at 141, 119 S.Ct. at 1171, 143 L.Ed.2d at 246.

¶30    The *Daubert* test does not require a district court to determine whether the expert reliably applied expert methods to the facts. Rather, if the witness is a qualified expert in the field, he may testify. Under a *Daubert* analysis, the reliability of Blanco's application of his expert field to the facts is immaterial in determining the reliability of that expert field. Rule 702, M.R.Evid., did not require the District Court to hold a *Daubert* hearing.

   *B.  Handwriting Expert's Opinion on an Ultimate Issue*

¶31    Cheryl argues, under Rule 702, M.R.Evid., that, although the District Court properly allowed Blanco to testify to similarities and dissimilarities between documents of unknown authorship and documents that Cheryl had written, it should not have allowed Blanco to testify to the ultimate conclusion that Cheryl authored the documents in question. Cheryl cites *United States v. Paul* (11th Cir. 1999), 175 F.3d 906, *United States v. Hines* (D. Mass. 1999), 55 F.Supp.2d 62, and two other federal district court cases for the proposition that, because the jury could have come to the ultimate conclusion without help from Blanco, Blanco need not have testified to that ultimate conclusion.[1]

¶32    Rule 704, M.R.Evid., provides that "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided

---

[1]Cheryl preserved this issue for appeal in her January 2, 2002, motion to prohibit Blanco from making ultimate conclusions.

11

by the trier of fact." This rule allows Blanco to testify to the ultimate conclusion of who wrote the letters.

### C. Qualifying a Witness as an Expert

¶33 Cheryl argues that, because Blanco, in his deposition, could not state the basis for his conclusion that Cheryl authored the letters, he had no scientific, technical, or specialized knowledge under Rule 702, M.R.Evid. Cheryl misapprehends the force behind Rule 702, M.R.Evid. To restate this rule, *if* a reliable field helps the trier of fact, *and* the court deems the witness qualified as an expert, *then* he may testify. Whether the witness has scientific, technical, or specialized knowledge bears on the question whether the witness qualifies as an expert. Although the District Court did not specifically rule that Blanco qualified as an expert, Cheryl did not object to his testimony for lack of qualification. This Court does not address issues raised for the first time in this Court. *State v. White Bear*, 2005 MT 7, ¶ 10, 325 Mont. 337, ¶ 10, 106 P.3d 516, ¶ 10. We decline to address this argument.

## II. Adequate Probable Cause Upon Which to File an Information and

## IV. The Legal Sufficiency of Blanco's Opinion Testimony

¶34 Cheryl asserts, without much coherent argument, that the affidavit in support of the information lacked probable cause. Cheryl fails to provide even the statute requiring probable cause to file an information. Rule 23(a)(4), M.R.App.P., requires an appellant, in her brief, to cite to the authorities, statutes, and pages of the record she relied upon in her arguments to this Court. Absent such citation, we decline to consider the argument. *In re Marriage of Hodge*, 2003 MT 146, ¶ 10, 316 Mont. 194, ¶ 10, 69 P.3d 1192, ¶ 10.

12

¶35 Cheryl also argues that Blanco's testimony was the only concrete evidence against her, and it was insufficient as a matter of law to convict her. Cheryl did nothing more in her brief than raise the argument. She fails even to cite a case. We decline to consider this argument, also. *In re Marriage of Hodge*, ¶ 10.

### III. Blanco's Reasoning

¶36 Cheryl argues the District Court erred in refusing to continue the trial because the State had not provided Blanco's subjective judgments upon which he relied to conclude Cheryl wrote the documents. She cites § 46-15-322(1)(c), MCA (2001), for the proposition that the State must produce the "results of physical examinations, scientific tests, experiments, or comparisons . . . ." Although the State provided Cheryl with Blanco's five reports in which he related his conclusions, Cheryl claims that Blanco did not reveal his "results."

¶37 During his deposition, Blanco made some comparisons for the benefit of the attorneys. He compared Cheryl's known writings to the unknown writings for similarities. He showed them how he compared Cheryl's voluntary statement to the Helena Police Department with the "LYkES" letter. For example, the writings both had distinctive k's. Further, Blanco provided almost twenty documents on which he had made notations next to specific characters. The notations indicated that those characters had similarities with characters from other documents.

¶38 In January 2002, shortly after the deposition, the prosecution provided Blanco's eighteen-page affidavit in which he reiterated many of his deposition statements and

13

reorganized many of those statements into a clear outline to show his methods. During trial, he testified in more detail.

¶39    Experts should explain their reasoning, so the opposing party can prepare for trial. *See* §§ 46-15-322(1)(c) and 323(3) to (5), MCA (2001). With that information, the opposing party can attack the expert's reasoning as defective instead of merely attacking his conclusions as defective. At his deposition, Blanco provided fourteen of the documents of unknown origin on which he had made notations next to specific characters indicating those characters had similarities with characters from other documents that Cheryl had written. From the volume of similarities, he concluded that Cheryl had written the documents of unknown authorship. This explanation was sufficient for Cheryl's experts to understand Blanco's reasoning and methodology.

¶40    Cheryl also asserts that the District Court erred by denying a continuance so her handwriting expert, Lloyd Cunningham, could recover from an illness so he could testify in person rather than through video depositions. Cheryl did nothing more in her brief than raise the argument. She fails to develop the argument or cite any authority. Accordingly, we decline to address it. Rule 23(a)(4), M.R.App.P.; *In re Marriage of Hodge*, ¶ 10.

## V. Allowing Denbeaux to Testify

¶41    Mark Denbeaux is a law professor at Seton Hall Law School in Newark, New Jersey, who specializes in evidence law. He co-authored an article criticizing handwriting evidence. Denbeaux claims that, after many years of study, he has identified the defects and limitations of forensic handwriting witnesses' opinions and the reasons that handwriting analysis is

14

unreliable. Cheryl argues that the District Court erred by refusing to recognize Denbeaux as a qualified expert and prohibiting him from testifying. She asserts that Denbeaux's testimony would have cast doubt on Blanco's testimony, the reliability of handwriting expert testimony in general, and the weight of that evidence. The Federal Circuit Courts have disagreed on whether to allow Denbeaux's testimony. *Compare United States v. Velasquez* (3d Cir. 1995), 64 F.3d 844, 852 (refusing to admit Denbeaux's testimony *was* an abuse of discretion), *with Paul*, 175 F.3d at 912 (refusing to admit Denbeaux's testimony *was not* an abuse of discretion).

¶42 First, arguably, Denbeaux is not an expert in the field of handwriting analysis; rather, he is an evidence professor who has, historically, criticized handwriting analysis evidence. It was within the District Court's discretion to conclude that Denbeaux did not qualify as an expert in handwriting analysis. *State v. Southern*, 1999 MT 94, ¶ 48, 294 Mont. 225, ¶ 48, 980 P.3d 3, ¶ 48. Moreover, Cheryl presented the testimony of her own handwriting expert, and performed a thorough cross-examination of Blanco. Thus, even if Denbeaux's testimony might have cast doubt on Blanco's testimony, Cheryl was able to accomplish that task through the testimony of her expert and cross-examination. Under these circumstances, the District Court did not abuse its discretion in precluding Denbeaux's testimony.

**VI. Identity Evidence Linking Daniel Hurst to the Threatening Letters**

¶43 Cheryl contends that the District Court made numerous evidentiary rulings that violated her rights to present a defense. Specifically, she alleges the District Court erred by excluding Daniel's (1) prior sexual activity, (2) psychological problems, (3) behavioral

problems, (4) discharge from the U.S. Army for psychological reasons, (5) commitment to a mental health institution, and (6) conviction of vandalism in East Helena. Cheryl alleges this evidence qualifies under the seldom-used "reverse 404(b)" theory to identify Daniel as the author of the letters. By excluding that evidence, Cheryl contends the District Court violated Rule 404(b), M.R.Evid., her right to present a defense under due process, and the right to confront witnesses against her under the Sixth Amendment to the United States Constitution.

### A. Reverse 404(b) Evidence

¶44    Cheryl sought to admit Daniel's prior sexual history and psychological profile to show that he, and not Cheryl, wrote the letters. On occasion, a defendant will use Rule 404(b), M.R.Evid., to introduce evidence to inculpate another person, thus exculpating himself. Courts call evidence introduced for this purpose "reverse 404(b) evidence." *United States v. Stevens* (3d Cir. 1991), 935 F.2d 1380, 1401-02. Since the defendant is offering the reverse 404(b) evidence, courts applying the Rule 403, M.R.Evid., balancing test cannot consider the risk of unfair prejudice to the defendant. *Stevens*, 935 F.2d at 1404-05 ("[T]he admissibility of 'reverse 404(b)' evidence depends on a straightforward balancing of the evidence's probative value against considerations such as undue waste of time and confusion of the issues.").

¶45    Although the State raises the specter of prejudice to the government, it fails to develop that theory. Unfair prejudice against the government is rather rare. "'Unfair prejudice' within its context means an undue tendency to suggest decision on an improper basis,

16

commonly, though not necessarily, an emotional one." Fed. R. Evid. 403 advisory committee's note; *see Southern*, ¶ 67. Thus, the only possible unfair prejudice against the government occurs when the evidence tends to make the jury more likely to find a defendant not guilty *despite* the proof beyond a reasonable doubt. *See, e.g., Old Chief v. United States* (1997), 519 U.S. 172, 185 n.8, 117 S.Ct. 644, 652 n.8, 136 L.Ed.2d 574, 591 n.8. By proving that someone else committed the crime, reverse 404(b) evidence is not likely to generate that risk of jury infidelity, and thus does not generate unfair prejudice. Only in the rarest circumstances will the district court be presented with unfair prejudice to the State in determining the admissibility of reverse 404(b) evidence. Those circumstances are not present here.

### B. The Modified *Just Rule*

¶46 The District Court excluded six categories of evidence that pointed toward Daniel. Cheryl argues that this evidence of misidentification was admissible as reverse 404(b) evidence tending to show that Daniel, and not Cheryl, wrote the letters. The District Court granted the State's motion in limine to exclude evidence of Daniel's other crimes, wrongs, or acts. Under Rule 404(b), M.R.Evid., the District Court decided the modified *Just* rule, articulated in *State v. Matt* (1991), 249 Mont. 136, 814 P.2d 52, allowed it to exclude evidence of Daniel's specific acts.

¶47 Rule 404(b), M.R.Evid., provides that

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportu-

nity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

To be admissible under Rule 404(b), the modified *Just* rule requires that the other crimes, wrongs, or acts (1) must be similar and (2) not remote in time. *Matt*, 249 Mont. at 142, 814 P.2d at 56. Such evidence (3)

> is not admissible to prove the character of a person in order to show that he acted in conformity with such character; but may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

*Matt,* 249 Mont. at 142, 814 P.2d at 56. Finally, (4) although relevant, a court may exclude evidence if the danger of unfair prejudice, confusion of the issues, misleading of the jury, considerations of undue delay, waste of time, or needless presentation of cumulative evidence substantially outweighs its probative value. *Matt*, 249 Mont. at 142, 814 P.2d at 56.

### C. Propensity Evidence

¶48 "'The difference between the proper use of other acts evidence to prove identity and the improper use of such evidence to prove propensity is a subtle matter.'" *State v. Sweeney*, 2000 MT 74, ¶ 32, 299 Mont. 111, ¶ 32, 999 P.2d 296, ¶ 32 (quoting *United States v. Luna* (9th Cir. 1994), 21 F.3d 874, 882). Indeed, this classification forms the crucial distinction at the basis of the third prong of the modified *Just* test. Specifically, if the proponent for admissibility offers the evidence solely to show propensity, Rule 404(b), M.R.Evid., prohibits courts from admitting that evidence. "When evidence of prior bad acts is offered, the proponent must clearly articulate how that evidence fits into a chain of logical inferences,

no link of which may be the inference that the defendant has the propensity to commit the crime charged."[2] *United States v. Himelwright* (3d Cir. 1994) , 42 F.3d 777, 782 (interpreting Rule 404(b), Fed. R. Evid.); *People v. Zackowitz* (N.Y. 1930), 172 N.E. 466 (Cardozo, C.J., delivering the opinion of the court).

¶49    Of the six categories of evidence that Cheryl offers, four of them (psychological problems, behavioral problems, discharge from the U.S. Army for psychological reasons, and commitment to a mental health institution) provide only propensity evidence.  Cheryl contends that Daniel has psychological problems, so he acted in conformity with those problems by writing the letters; he has behavioral problems, so he acted in conformity with those problems by writing the letters; etc.  These chains of inferences clearly implicate propensity evidence.

¶50    Someone vandalized the Cliffords' car by spray-painting profanities in pink.  Cheryl sought to admit evidence that Daniel had been convicted for vandalizing cars in East Helena.  That evidence also creates a chain of inferences implicating propensity evidence:  Daniel vandalized cars in East Helena, therefore he is a vandal, therefore he acted in conformity with that character trait when he vandalized the Cliffords' car.  Evidence in this category is clearly inadmissible propensity evidence.

---

[2]The Third Circuit, here, refers to "prior bad acts," but Rule 404(b), M.R.Evid., has no requirement that the other acts be "bad."  *See* Rule 404(b), M.R.Evid. ("(b) Other crimes, wrongs, acts.  Evidence of other crimes, wrongs, or acts . . . may, however, be admissible for other purposes . . . .").

¶51    The more difficult question arises when considering the admissibility of specific, prior sexual activities in which Daniel, willingly or unwillingly, participated. At various points, Cheryl wanted the court to admit evidence of or allow examination into various experiences including the specific acts of sodomy to which Michael Scott subjected Daniel, the presence of two other men while Michael Scott molested Daniel, the specifics of Daniel being molested when he was very young, and the specific acts of incest. The District Court admitted references to the acts, but excluded the specific activities. Evidence proving these specific facts is relevant to the identity of the author, Cheryl argues, because the letters refer to specific acts of sodomy, a "buttfuck party," and specific incestuous acts.

¶52    The District Court excluded these categories of evidence under the modified *Just* rule. Unfortunately, we cannot discern which rationale the court used to exclude the evidence. The fourth prong of that test repeats Rule 403, M.R.Evid. *Compare* Rule 403, M.R.Evid., *with Matt*, 249 Mont. at 142, 814 P.2d at 56. Generally, we review a district court's discretionary Rule 403, M.R.Evid., decisions for abuse of discretion, but we agree with the *Himelwright* court that when a district court rules on a Rule 403, M.R.Evid., question, but its reasons are not apparent from the record, we cannot review its discretion. *Himelwright*, 42 F.3d at 781. In such cases, we may examine the record and balance the factors ourselves. *Himelwright*, 42 F.3d at 781. Accordingly, we will balance the Rule 403 factors de novo.

¶53    Rule 403, M.R.Evid., provides that,

[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

"The greater contains the less." Section 1-3-227, MCA. The District Court admitted copious amounts of evidence that Michael Scott had molested Daniel. No fewer than six witnesses testified that Michael Scott had molested Daniel, and that theme pervaded the case. As stated earlier, because these categories of evidence constitute reverse 404(b) evidence, this Court may not consider the danger of unfair prejudice in its balancing. Nevertheless, the jury need not have heard the multiple, graphic details painstakingly recounting the horrors through which Michael Scott put Daniel. The jury's imagination could quickly fill in the gaps without such detailed evidence. Thus, the probative value is very low. Taken together, the waste of time and needless presentation of cumulative evidence from such technical, detailed, and vivid explanations substantially outweigh the low probative value of that evidence. A similar analysis shows the District Court properly excluded specific evidence of Daniel's molestation.

¶54 In addition, the District Court allowed questions as to whether Daniel committed incest, but did not allow questions as to the specific acts. As above, the waste of time and needless presentation of cumulative evidence substantially outweigh the probative value of dwelling upon the specific instances. The District Court properly excluded this evidence.

¶55 Finally, the District Court also admitted evidence that other boys participated in the molestations at Michael Scott's home. Given this evidence that Daniel experienced a "buttfuck party," evidence that two other men were present at other times amounts to needless presentation of cumulative evidence. The needless presentation of that cumulative evidence substantially outweighs the negligible probative value. Because these evidentiary items fail one prong of the modified *Just* test, we need not address the remaining prongs for admissibility. The District Court did not err by excluding this evidence.

### D. Right to Put on a Defense

¶56 Cheryl cites *State v. Johnson*, 1998 MT 107, 288 Mont. 513, 958 P.2d 1182, for the proposition that the reliable nature of the "identity" evidence was sufficient to tip the scales in favor of Cheryl's constitutional right to present a defense. *Johnson* addresses the balance between the defendant's right to present a defense and the victim's rights under the rape shield statute. ¶ 18-34. Cheryl's argument is very sparse and she fails to identify even the two interests on the scales. "A defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions." *United States v. Scheffer* (1998), 523 U.S. 303, 308, 118 S.Ct. 1261, 1264, 140 L.Ed.2d 413, 418. Cheryl has not shown that these evidentiary restrictions are unreasonable, so we hold that they do not violate her right to present a defense.

## VII. Cordes Facts in the Application for the Search Warrant

¶57 Cheryl asserts that the application for a search warrant for the Cliffords' residence contained nothing more than the subjective beliefs of Cordes. Cheryl argues that the whole

22

affidavit in support of the application for the search warrant contains only subjective beliefs, false statements, and misrepresentations. Cheryl cites *Franks*, 438 U.S. at 155-56, 98 S.Ct. at 2676, 57 L.Ed.2d at 672, for the proposition that a court must excise false statements and consider the remaining statements to determine whether probable cause existed for the issuance of the search warrant.

¶58    In her argument, Cheryl fails to recognize that *State v. Worrall*, 1999 MT 55, ¶¶ 29-34, 293 Mont. 439, ¶¶ 29-34,  976 P.2d 968, ¶¶ 29-34, requires her to prove by a preponderance of the evidence that the statements in the affidavit were false. *Franks*, 438 U.S. at 164-65, 98 S.Ct. at 2681, 57 L.Ed.2d at 677-78; *Worrall*, ¶¶ 32-35.  Without providing any evidence, Cheryl merely claims that the assertions were subjective beliefs, false statements, and misrepresentations. Because Cheryl did not establish falsity as required under *Worrall* or *Franks*, the District Court did not err by refusing to exclude the evidence obtained in the search.

¶59    Affirmed.

/S/ W. WILLIAM LEAPHART

We Concur:

/S/ PATRICIA O. COTTER
/S/ JAMES C. NELSON
/S/ JOHN WARNER
/S/ BRIAN MORRIS

Justice James C. Nelson concurs.

¶60    I concur in our Opinion because the trial court correctly followed Montana law as it presently exists.  I write separately to point out the errors in that law and to urge correcting our case law and amending Rule 702, M.R.Evid.

## A.  The Federal Trilogy

¶61    In 1993, the United States Supreme Court decided the first of what was to be a trilogy of cases dealing with the admissibility of expert testimony.  In *Daubert v. Merrell Dow Pharm., Inc.* (1993), 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469, the Court held that Federal Rule of Evidence 702 requires that expert scientific evidence be subject to a reliability test, rather than the common law "general acceptance" test of *Frye v. United States* (D.C. Cir. 1923), 293 F. 1013, 1014.  *Daubert*, 509 U.S. at 589-90, 113 S.Ct. at 2794-95. The *Frye* test was superseded by Rule 702.  *Daubert*, 509 U.S. at 589, 113 S.Ct. at 2794. Accordingly, the Court required that, when faced with a proffer of expert scientific testimony, the trial judge,  pursuant to Rule 104(a), must make a preliminary assessment of whether the testimony's underlying reasoning and methodology is scientifically valid and can be properly applied to the facts at issue.  *Daubert*, 509 U.S. at 592-93, 113 S.Ct. at 2796. This is referred to as the courts' "gatekeeping" function. *Daubert*, 509 U.S. at 597, 113 S.Ct. at 2798.

¶62    The Court set forth various, flexible considerations that will bear on this inquiry, including, whether the theory or technique in question can be (and has been) tested; whether it has been subjected to peer review and publication; its known or potential error rate and the

24

maintenance of standards controlling its operation; and whether it has attracted widespread acceptance within the relevant scientific community. *Daubert*, 509 U.S. at 593-94, 113 S.Ct. at 2796-97. The Court observed that the inquiry is to be a flexible one, focusing solely on principles and methodology, not on the conclusions they generate, and being mindful of other applicable Rules. *Daubert*, 509 U.S. at 594-95, 113 S.Ct. at 2797. Finally, the Court stated that cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof, rather than wholesale exclusion under an uncompromising general acceptance standard, is the appropriate means by which evidence based on valid principles may be challenged. *Daubert*, 509 U.S. at 596, 113 S.Ct. at 2798.

¶63 The second case in the trilogy was *General Electric Co. v. Joiner* (1997), 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508. In *Joiner*, the Court clarified *Daubert* in two respects. First the Court noted that trial courts could scrutinize the reliability of a proffered expert's reasoning process as well as his or her methodology. The Court stated that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Joiner*, 522 U.S. at 146, 118 S.Ct. at 519. Second, *Joiner* made clear that abuse of discretion is the proper standard by which an appellate court should review a district court's decision to admit or exclude expert scientific evidence. *Joiner*, 522 U.S. at 146, 118 S.Ct. at 519.

¶64 The final of the three cases was *Kumho Tire Co., Ltd. v. Carmichael* (1999), 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238. In this case the Court applied *Daubert's* gatekeeping obligation to not only expert scientific evidence, but, as well, to all expert testimony. *Kumho*

*Tire*, 526 U.S. at 141,119 S.Ct. at 1171. Furthermore, the Court emphasized the importance of the gatekeeping requirement, noting that "[t]he objective of that requirement is to ensure the reliability and relevancy of expert testimony [and] to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152, 119 S.Ct. at 1176.

### B. Montana's Approach

¶65     Montana did away with the *Frye* general acceptance test before *Daubert*. In *Barmeyer v. Mont. Power Co.* (1983), 202 Mont. 185, 193, 657 P.2d 594, 598, we rejected the *Frye* test as not being "in conformity with the spirit of the new rules of evidence." We adopted the reasoning of *United States v. Baller* (4th Cir. 1975), 519 F.2d 463, 466, wherein the Fourth Circuit Court of Appeals held that "it is better to admit relevant scientific evidence in the same manner as other expert testimony and allow its weight to be attacked by cross-examination and refutation." *Barmeyer*, 202 Mont. at 193-94, 657 P.2d at 598. Nearly twelve years later, we adopted *Daubert*, concluding that "before a trial court admits scientific expert testimony, there must be a preliminary showing that the expert's opinion is premised on a reliable methodology." *State v. Moore* (1994), 268 Mont. 20, 42, 885 P.2d 457, 471.

¶66     Unfortunately, we also stated that the *Daubert* guidelines were consistent with *Barmeyer* concerning the admission of "novel scientific evidence." *Moore*, 268 Mont. at 42, 885 P.2d at 471. I say "unfortunately" because, as it turns out, we have, since, essentially done away with the *Daubert* standards by limiting the requirements of that case and the

26

courts' gatekeeping obligation to proffered expert testimony *of "novel" scientific evidence* only. *See State v. Cline* (1996), 275 Mont. 46, 55, 909 P.2d 1171, 1177; *Hulse v. State*, 1998 MT 108, ¶¶ 55-69, 289 Mont. 1, ¶¶ 55-69, 961 P.2d 75, ¶¶ 55-69; *State v. Southern*, 1999 MT 94, ¶ 59, 294 Mont. 225, ¶ 59, 980 P.2d 3, ¶ 59; *Gilkey v. Schweitzer*, 1999 MT 188, ¶¶ 18-20, 295 Mont. 345, ¶¶ 18-20, 983 P.2d 869, ¶¶ 18-20; *State v. Hocevar*, 2000 MT 157, ¶ 56, 300 Mont. 167, ¶ 56, 7 P.3d 329, ¶ 56; *State v. Ayers*, 2003 MT 114, ¶ 37, 315 Mont. 395, ¶ 37, 68 P.3d 768, ¶ 37. *See also* Robert L. Sterup, *Into the Twilight Zone: Admissibility of Scientific Expert Testimony in Montana after* Daubert, 58 Mont. L. Rev. 465, 485-86 (Summer 1997) (hereinafter *Sterup*).

¶67     In doing so, we have committed an error of logic. The proposition that "A implies B" is not the equivalent of "non-A implies non-B," and neither proposition follows logically from the other. The process of inferring one from the other is known as the fallacy of "denying the antecedent." *Crouse-Hinds Co. v. InterNorth, Inc.* (2nd Cir. 1980), 634 F.2d 690, 702-03 (citing J. Cooley, *A Primer of Formal Logic* 7 (1942)). In *Cline*, we committed this error when we essentially reasoned that if "novel" scientific evidence requires a *Daubert* hearing, then non-"novel" scientific evidence does not require a *Daubert* hearing. *Cline*, 275 Mont. at 55, 909 P.2d at 1177. Therefore, if the proffered scientific evidence is not "novel," our approach, based on *Barmeyer*, is to admit relevant scientific evidence in the same manner as other expert testimony, and to allow its weight to be attacked by cross-examination and refutation. *Moore*, 268 Mont. at 41-42, 885 P.2d at 470-71. *See also Hulse*, ¶ 69, *Southern*, ¶ 59, *Hocevar*, ¶¶ 56-61, and *Ayers*, ¶¶ 37-50.

¶68 While, arguably, the DNA evidence considered in *Moore* was "novel" in 1994, as far as Montana was concerned, and while *Daubert* was consistent with *Barmeyer* (without applying *Daubert's* various standards, *per se*), our "consistency" observation grew into an exception which has effectively now swallowed *Daubert*. Worse, as I will discuss later, in imposing this limitation we have not only turned the *Daubert* approach on its head, unreasonably constraining, in the process, the trial judge's gatekeeping function, but we have rejected *Kumho Tire*[1], and have paved the way for the admission of "scientific" evidence whose reliability and methodology have never been subject to any level of intellectual rigor. *Contra Kumho Tire*, 526 U.S. at 152, 119 S.Ct. at 1176. Indeed we have, as this case demonstrates, fallen in to the trap of admitting expert scientific opinion that is connected to existing data only by the *ipse dixit* of the expert, *contra Joiner*, 522 U.S. at 146, 118 S.Ct. at 519--the only exception being for that scientific evidence which is not "novel."[2] We have come to accept the notion that certain disciplines, techniques, methods, "sciences" and even some presumptions are grounded in scientific principle; are not "novel;" and are, therefore, presumptively reliable without more. It is to that problem that I now turn.

---

[1] We have not had occasion to consider *Joiner*, but our standard of review of a trial court's evidentiary rulings has historically been that of abuse of discretion. *Moore*, 268 Mont. at 36, 885 P.2d at 467. Whether that standard, or, where expert evidence is involved, a *de novo* standard of review is better, I leave to another day and another case. Furthermore, I leave to another case the question of whether the gatekeeper should focus its inquiry on simply the proffered scientific evidence at issue or on that evidence taken in the context of the totality of evidence offered.

[2] In fairness, I cannot claim too much moral high ground here, as I wrote *Moore* and authored and participated in other cited cases limiting *Daubert* to "novel" scientific evidence. In so doing, I will simply admit my error, having researched this issue further, and urge that we undo the mess we have collectively created.

## C. The Error of our Ways

¶69   I start with two relatively simple examples.

¶70   Conventional wisdom declares that eyewitness testimony is reliable. Notwithstanding, this Court has acknowledged that a large body of research and scholarship exists which demonstrates that eyewitness testimony can be unreliable and that, in appropriate cases, the trial court must, therefore, allow expert testimony on the reliability of eyewitness testimony. *State v. DuBray*, 2003 MT 255, ¶¶ 36-44, 317 Mont. 377, ¶¶ 36-44, 77 P.3d 247, ¶¶ 36-44.

¶71   Similarly, § 26-1-302, MCA, states that a witness is "presumed to speak the truth." In civil cases the jury is so instructed. Montana Pattern Jury Instruction (Civil) 1.02. Montana is one of a few jurisdictions that still instructs civil juries that witnesses are presumed to speak the truth. Tom Singer, *To Tell the Truth, Memory Isn't That Good*, 63 Mont. L. Rev. 337, 349 (Summer 2002) (hereinafter *Singer*). Most courts, including the federal courts, do not so instruct juries because scholarship and research have shown that the presumption is not reliable. *See Singer*, at 349-57. Absent outright confabulation or perjury, witnesses will testify to what they *believe* is the truth. *See Singer*, at 360-63. However, any witness's view of the "truth" is filtered through that person's life experiences, biases and preconceptions along with his or her powers of observation, ability to retain and recall--processes which are highly dependent upon a host of psychological and physiological factors--and on one's ability to communicate. *See Singer*, at 358-64. The "truth" may be the witness's perceived, subjective understanding of what he or she saw or heard, or it may be the "truth" in some larger or more objective and absolute sense. *See Singer*, at 355-56.

29

¶72    Many times each year, we somberly intone the mantra: "credibility and weight given to the evidence is within the province of the jury and will not be disturbed unless the jury's findings are inherently impossible to believe." *Papich v. Quality Life Concepts, Inc.,* 2004 MT 116, ¶ 29, 321 Mont. 156, ¶ 29, 91 P.3d 553, ¶ 29. If we really believe that, we should not require the trial court to invade the province of the jury by instructing jurors that they must presume the truthfulness of the witnesses they hear testify. Ultimately it is up to them who and what to believe.

¶73    Criminal cases have the potential for generating even more serious evidentiary problems. Professors David E. Bernstein and Jeffrey D. Jackson state that

> the admission of forensic evidence in criminal cases remains relatively routine. Legal commentators agree that the *Daubert* trilogy has had far less of a constricting effect on forensic science evidence compared with its effect on evidence in torts cases, most likely because defense attorneys in routine criminal cases lack the resources and expertise to challenge the admission of scientific evidence. Moreover, because all three cases in the *Daubert* trilogy arose in the civil context, lower courts seem more inclined to overcome their traditional inertia about admitting scientific evidence in that context.

David E. Bernstein & Jeffrey D. Jackson, *The* Daubert *Trilogy in the States*, 44 Jurimetrics J. 351 n.17 (Spring 2004). This potential for the routine admission of "scientific" evidence is precisely what Justice Patricia O. Cotter criticized in *State v. Damon*, 2005 MT 218, ___ Mont. ___, ___ P.3d ___, (Cotter, P., dissenting), where she predicted that "[t]rial courts will admit the PBT [or, preliminary breath test] evidence because we have said it is admissible,

its scientific validity having now been decreed as a matter of law. That is all that will matter."[3] *Damon*, ¶ \_\_\_.

¶74 And, unfortunately, the case *sub judice* presents another example of the results of a "scientific" discipline being admitted through expert testimony without application of a rigorous *Daubert* approach.

¶75 In her article, *Scripting Expertise: The History of Handwriting Identification Evidence and the Judicial Construction of Reliability*, 87 Va. L. Rev. 1723 (2001) (hereinafter *Mnookin*), Professor Jennifer L. Mnookin argues for the application of *Daubert* standards to expert forensic evidence in criminal cases in various sciences and disciplines that have been and are considered presumptively reliable.

¶76 Professor Mnookin observes that some long-accepted forensic science evidence has recently received greater public scrutiny not only because the "experts" proffering the evidence were either astonishingly inept or downright corrupt,[4] but also because of recent

---

[3] It bears mentioning that the underlying "science" involved in PBT instruments is not the problem. Rather, it is the lack of training, the failure to set rigorous calibration and testing standards and the actual field use of these instruments that contributes to their being unreliable for substantive evidence purposes. Unfortunately, it will now be a cold day in a hot place before any trial court in Montana refuses to accept PBT evidence in cases after *Damon*. We've declared such evidence reliable as a matter of law and underpaid, overworked and in many cases ill trained and unsophisticated defense attorneys are often not going to do the rigorous job of calling the witnesses and doing the cross-examination necessary to attack, not the science, but the methodology of PBT use. As Justice Cotter predicts, trial judges are simply going to admit PBT results as substantive evidence routinely; and, I predict, will just as routinely deny motions for *Daubert* hearings on PBT method validity.

[4] There are numerous examples in the literature but, to cite just a few, there is Fred Zain, a West Virginia forensic serologist who misstated or altered results in more that 130 cases. *See In re an Investigation of the W. Va. State Police Crime Lab., Serology Div.* (W.Va. 1993), 438 S.E.2d 501. Also, there is Ralph Erdmann, a Texas pathologist who was eventually convicted of

scientific developments such as DNA tests which have revealed the limitations of forensic techniques such as hair identification analysis. *Mnookin*, at 1725. Additionally, Professor Mnookin observes that several of the forensic sciences, including expert handwriting identification and fingerprint analysis, are now being criticized by historians, forensic watchdogs, and law professors who claim that these forensic techniques are not grounded in good science, that they have been inadequately tested, and that their methods have been insufficiently scrutinized. *Mnookin*, at 1725-26. She states:

> Credible arguments have been leveled that these forms of evidence, though routinely used in courtrooms for a century or so, do not withstand scrutiny under *Daubert*. While no judge has yet excluded fingerprinting evidence on reliability grounds, courts are beginning to rein in handwriting experts.

*Mnookin*, at 1726-27.[5]

---

felonies relating to autopsies that he botched and falsified. *See* Richard L. Fricker, *Pathologist's Plea Adds to Turmoil: Discovery of Possibly Hundreds of Faked Autopsies Helps Defense Challenges*, 79 A.B.A. J. 24 (March 1993). And Montana has its own--Arnold Melnikoff, formerly a forensic scientist with the State Crime Lab, whose testimony regarding hair analysis was called into question by subsequent DNA tests which exonerated several individuals who were convicted, in part, based on his testimony.

[5] *See also*, for example, *United States v. Starzecpyzel* (S.D.N.Y. 1995), 880 F. Supp. 1027, 1041-47, in which the court believed that the testimony failed *Daubert*, but admitted the testimony as non-scientific expert evidence, an approach that *Kumho Tire* would prohibit. Some judges have rejected handwriting comparison expertise: *United States v. Brewer* (N.D. Ill. 2002), 2002 WL 596365, at *8; *United States v. Lewis* (S.D.W.Va. 2002), 220 F. Supp. 2d 548, 554; *United States v. Saelee* (D. Alaska 2001), 162 F. Supp. 2d 1097, 1106. *See also United States v. Crisp* (4th Cir. 2003), 324 F.3d 261; *United States v. Fleishman* (9th Cir. 1982), 684 F.2d 1329. The realm of academia has produced vigorous debate about handwriting identification evidence: D. Michael Risinger, *et al.*, *Exorcism of Ignorance as a Proxy for Rational Knowledge: The Lessons of Handwriting Identification "Expertise,"* 137 U. Pa. L. Rev. 731 (1989); D. Michael Risinger & Michael J. Saks, *Science and Nonscience in the Courts:* Daubert *Meets Handwriting Identification Expertise,* 82 Iowa L. Rev. 21 (1996); Andre A. Moenssens, *Handwriting Identification Evidence in the Post-*Daubert *World*, 66 UMKC L. Rev. 251 (1997); and D. Michael Risinger, *et al.*, *Brave New "Post-*Daubert *World" -* A Reply to Professor Moenssens, 29

¶77   It is beyond the scope of this concurrence to exhaustively plumb the reliability (or unreliability) of handwriting comparison analysis. Professor Mnookin and the authorities she cites do an admirable job of that. Rather, a defense attorney must take this issue head on in an actual case, present the expert testimony on the reliability of handwriting comparison analysis, and write and argue the motion *in limine*. And it will take a trial court that is willing to listen to the evidence and rule on something more of a basis than that upon which courts have admitted handwriting identification testimony for years.

## D. The Case *Sub Judice*

¶78   This should have been that case, but Clifford's request for a *Daubert* hearing on Blanco's testimony was denied. Under a correct application of *Daubert* the court's ruling would have been error. But the trial judge followed Montana law. And that brings me back to how we have jurisprudentially and improperly limited *Daubert*.

¶79   In the case at bar there was no showing that handwriting analysis is a "novel" science or discipline--even though Clifford had problems with how Blanco *conducted* his analysis. Although *Daubert* unmistakably covers not only the question of "field validity"--i.e., whether the expert information is within a valid category of expertise and whether there is a field of knowledge that has credible tools to produce valid answers to questions--*Daubert* also requires "method validity." *Daubert*, 509 U.S. at 592-93, 113 S.Ct. at 2796. Method validity assumes the validity of the field, but answers the question of whether the methods used in the case were capable of producing valid answers. *Daubert* and *Kumho Tire* make

Seton Hall L. Rev. 405 (1998).

33

method validity a prerequisite for the admission of expert evidence. Expert scientific testimony is admissible under *Daubert* only if it is the product of reliable principles and methods. *Daubert*, 509 U.S. at 592-93, 113 S.Ct. at 2796. In fact, *Daubert*, *Joiner*, and *Kumho Tire* all were concerned with method validity. *Daubert*, 509 U.S. at 592-93, 113 S.Ct. at 2796; *Joiner*, 522 U.S. at 146, 118 S.Ct. at 519; *Kumho Tire*, 526 U.S. at 152,119 S.Ct. at 1176.

¶80     Under the trilogy of cases, Clifford was entitled to a *Daubert* hearing on Blanco's testimony as to method validity. She, of course, did not get such a hearing because handwriting comparison is not deemed to be "novel" scientific evidence, inasmuch as it has been admitted in court rooms in this State (and in other states) for years on the assumption it was a valid and reliable discipline.[6]

¶81     Because of the limitations we have jurisprudentially placed on *Daubert*--limiting its application to "novel" scientific evidence--Clifford's concern that Blanco's methodology did not produce valid results could not be the subject of a rigorous *Daubert* hearing. Rather, under Montana law her concerns would have to be addressed via *Barmeyer*--i.e., through cross-examination and refutation; something she attempted to do with Mark Denbeaux's testimony.

¶82     And there's the anomaly. Since the field validity of handwriting comparison, as a discipline, was presumed--i.e., since it was deemed reliable--the court effectively

---

[6] This Court has not directly taken on the issue of the reliability of handwriting identification, but we have compared handwriting analysis to fingerprint analysis: *State v. Bashor* (1980), 188 Mont. 397, 414-15, 614 P.2d 470, 480.

determined that expert scientific evidence *attacking* the validity of Blanco's methods was "novel" and, therefore subject to *Daubert*. Thus, under Montana law, it would have been improper for the trial court to admit Denbeaux's testimony in front of the jury without a pre-trial *Daubert* hearing. We've turned *Daubert* on its head.

## E. Summary

¶83    In summary, under a correct application of *Daubert*, Clifford would have been entitled to a pre-trial *Daubert* hearing on the validity of Blanco's methodology. However, because of the manner in which we have limited *Daubert* (to "novel" scientific evidence), we placed Clifford in the anomalous position of having to request a *Daubert* hearing on Denbeaux's testimony attacking Blanco's methodology--it was Denbeaux's theories that were, after all, "novel." Since handwriting analysis has long been recognized by courts as generally reliable and admissible, we forced upon Clifford the obligation to demonstrate that handwriting analysis, as a science or discipline--versus the methodology involved--is unreliable.

¶84    As noted, Montana's case law holds that subjecting expert testimony to the rigors of *Daubert* is necessary only when the science or discipline at issue is "novel." We have erred in so limiting *Daubert*. We live in a world where scholarship and research are, in many cases, debunking conventional wisdom and assumptions about tests, analyses, disciplines and presumptions that the courts have long relied upon, have assumed are grounded in bedrock science and are, therefore, generally reliable.

¶85    If a litigant wants to challenge one of these tests, analyses or disciplines via *Daubert*--be it handwriting analysis, fingerprint analysis, or hair comparison--he or she

35

should have the ability to do so, regardless of whether the test, analyses or discipline is "novel." Our limitation on the use of *Daubert* has put the onus on the challenger--like Clifford--to prove that a test, analyses, discipline or presumption which is presumed reliable--often for no other reason than that it has been in use or in the courts for a long period of time--is not, in fact, reliable; that it is invalid as a field. Indeed, under our approach, a litigant--like Clifford--is precluded from attacking the methodology of one of these fields without first successfully attacking the reliability of the field itself.

¶86 This approach turns *Daubert* on its head; it severely constrains the trial court's gatekeeping function; and it puts us out of sync with the federal courts. *See Sterup*, at 479-87. It is time we reconsider our application of *Daubert* and *Barmeyer* to expert testimony. The case at bar is a perfect example of why.

### F. Recommendations

¶87 Specifically, we should overrule our case law to the extent that it limits the application of *Daubert* to "novel" scientific evidence. *Barmeyer*, while consistent with *Daubert* as far as it goes, does not require the sort of rigorous pre-trial standards that should apply when expert evidence is proffered. *Barmeyer* may be appropriate for non-expert testimony. However, in my view, expert evidence is different than non-expert evidence. We all--jurors included--tend to trust experts, and if there are legitimate questions as to whether the field itself is bogus or whether the methods used by experts do not produce reliable results, then that testimony and evidence should be subject to challenge pre-trial. Many cases involve

36

battles of experts. Neither side should have to contend with "expert" testimony that is unreliable.

¶88     Moreover, litigants who wish to challenge some of forensic science's main-stays--handwriting comparison being the one at issue here--and the intellectual rigor of the "experts" who testify in those fields, should have the ability to do so using *Daubert*. It may just turn out that handwriting comparison is not any more reliable than eyewitness testimony or the presumption that witnesses speak the truth. Our limitation of *Daubert* constrains the trial court's gatekeeping function, and, as noted above, turns *Daubert* on its head.

¶89     We also need to adopt *Kumho Tire* in the appropriate case. There is no reason that, in Montana, *Daubert* should not also apply to all expert testimony, not just that involving expert scientific evidence.

¶90     Finally, we need to amend Rule 702, M.R.Evid. Federal Rule 702, regarding expert testimony, provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, *if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.*

(Emphasis added). Montana's Rule 702, ends at the word "otherwise," right before the italicized portion of the Federal Rule 702. We need to amend Montana's rule to conform to the federal rule.

¶91     I concur because the trial court followed Montana law.  It is that law that needs to be changed.

/S/ JAMES C. NELSON

Justice Patricia O. Cotter joins in the concurrence of Justice James C. Nelson.

/S/ PATRICIA O. COTTER